JAMES MONAGHAN *et al.* Appellees, *vs.* BRIDGET GREEN *et al.* Appellants.

*Opinion filed October 16, 1914—Rehearing denied Dec. 2, 1914.*

1. WITNESSES—*when relationship of a witness to complainants does not disqualify her.* The fact that a witness offered in a will contest case is the mother of the complainants does not make her an interested party nor constitute any objection to her testifying if she is otherwise qualified.

2. SAME—*when widow of testator cannot testify.* In a will contest case the widow of the testator is not a competent witness to testify to the mental condition of the testator, even though she has been divorced from him for some time, where her testimony concerns conversations, facts and circumstances occurring during the time the marital relation existed, the knowledge of which she obtained only by means of such relation.

3. APPEALS AND ERRORS—*when objection to action in refusing instructions cannot be considered.* An objection to the action of the court in refusing certain instructions in a will contest case cannot be considered on appeal, where such objection was not assigned as one of the grounds of the motion for a new trial.

APPEAL from the Circuit Court of Madison county; the Hon. GEORGE A. CROW, Judge, presiding.

KEEFE & SULLIVAN, and B. J. O'NEILL, for appellants.

D. H. MUDGE, and GEO. W. CROSSMAN, for appellees.

Mr. JUSTICE COOKE delivered the opinion of the court:

The appellees, James Monaghan and Frank Monaghan, filed their bill in the circuit court of Madison county to contest the will of their father, William Monaghan, deceased, on the ground that he was of unsound mind, and on the further ground that appellants Bridget Green, James Green, her son, and Thomas Green, her husband, procured the execution of the will by means of undue influence. The issue as to whether the instrument in controversy is the last will and testament of William Monaghan has been twice submitted to a jury and each trial has resulted in a verdict in favor of the contestants. The first verdict was set aside by the chancellor and a new trial granted. When the same verdict was returned upon the second trial the court overruled the motion for a new trial and entered a decree finding the instrument in controversy to be null and void and setting aside the probate thereof. From that decree the defendants to the bill have prosecuted this appeal.

William Monaghan, the testator, died at the home of his sister, Bridget Green, in Alton, December 14, 1911. He was about sixty-six years of age at the time of his death. He left him surviving his sons, James Monaghan and Frank Monaghan, the appellees, and his mother, his brothers, Thomas, John and James, and his sisters, Bridget Green and Margaret Mullen. His wife, Susan Monaghan, to whom he was married in 1869, obtained a divorce from him in 1908 or 1909. She also survived him. The will in controversy was executed September 28, 1911. By this will he devised his real estate to his sisters, Bridget Green and Margaret Mullen, his brother, John Monaghan, and his nephew, James Green, giving to Bridget Green a lot upon which he had in 1910 erected a building for use as a saloon and which was the most valuable tract of real estate owned by him. He left no personal property. His brother Thomas Monaghan, and Thomas Green, the husband of Bridget Green, were named as executors of the will. The eighth

clause of the will provided that his sons, James and Frank, should have no share in his estate. The evidence shows that he located at Alton about the year 1892, and from that time until 1908 conducted a saloon in a building which he erected and in which he and his wife also conducted a hotel. This building was known as the Monaghan Hotel. In 1907 he left his wife and was taken into the home of his sister, Bridget Green, where he resided until the time of his death. In 1908 he sold his saloon business and was not thereafter actively engaged in that business. In 1909 his wife instituted suit against him for partition of the Monaghan Hotel property and for an accounting. He contested the suit and his two sons testified therein on behalf of their mother. The evidence on behalf of the appellants tends to show that thereafter he made statements to some of his friends to the effect that as his sons had assisted their mother in that litigation they would get none of his property, while the evidence on behalf of appellees tends to show that thereafter he remained on friendly terms with his sons. In 1910, after the partition proceedings had resulted in a sale of the Monaghan Hotel property, he purchased a lot and erected a two-story building thereon. This is the property which he devised to Bridget Green. He rented the first floor of the building to Thomas Green, who thereafter conducted a saloon, known as the Bee Hive saloon, therein. The second floor was arranged for a dance hall and was rented for that purpose by William Monaghan to other parties. The evidence further shows that William Monaghan had for years used intoxicating liquors to excess, and that during the last year of his life he spent most of his time in the Bee Hive saloon and in a saloon conducted by a man named Schmerge. For several years he was afflicted with a disease of the bladder, which manifested itself during the later years of his life by a nervous or palsied condition of the hands. The immediate cause of his death, according to the testimony of his physician,

was septic urea. His last illness covered a period of about a month, the last two weeks of which he was confined to his bed.

The testimony of the attorney who drew his will and of the two attesting witnesses to the will is, that at the time William Monaghan executed the will he was of sound mind and memory, and the testimony of the attending physician is that during his last illness he was of sound mind. In addition to these witnesses fifteen other witnesses called by the proponents, who had known Monaghan for a great many years and who frequently met and conversed with him during the last year of his life, testified that he was of sound mind. Among these witnesses was the cashier of the bank at which Monaghan transacted his banking business, several agents of breweries and wholesale liquor dealers with whom Monaghan had transacted business when he was conducting a saloon, a lawyer, an insurance agent and a lumber dealer.

Seventeen witnesses testified on behalf of the contestants, very few of whom testified positively that he was of unsound mind. George W. Hildebrandt, who seems to have been engaged in the business of operating slot machines, testified that he knew Monaghan about fourteen years; that during the last year of his life he was with him every week; that he frequently took buggy rides with him; that at times Monaghan talked "peculiar," by which the witness said he meant he would "forget himself," and at other times he would be all right; that they talked about some things which the witness said he would not repeat; that he told the witness things which the witness knew were unreasonable, and the next day he would tell the witness "different." When asked about his mental condition he replied that he could "hardly say about that."

John Falkenberg, a brother of Monaghan's divorced wife, testified that in 1884 or 1885 he was associated with Monaghan in operating a coal mine at Bethalto, Illinois;

that later the witness moved to Kansas City but at intervals returned to Bethalto and Alton to visit his relatives; that he observed that Monaghan was growing feeble in mind and body and could not get around as well as formerly; that about the first of November, 1911, he was in Alton and boarded a street car; that Monaghan was on the car; that the witness approached and shook hands with him; that Monaghan did not recognize the witness, but said, "You have got the best of me." From this circumstance the witness formed the opinion that his mind had become weakened.

Fritz Dahlquist testified that he knew Monaghan for six years; that he saw him nearly every day at Schmerge's saloon, playing cards and drinking whisky and beer; that he got excited and "talked right quick" when playing cards, and that his hands shook so that when he took up a glass of whisky or beer he would spill most of the contents. He further testified that at times Monaghan played a "pretty good game" of cards and at other times he did not know what he was doing.

Charles Reis testified that after the Bee Hive saloon was built he saw Monaghan on one occasion in Schmerge's saloon; that he was short some money and asked the witness to count his money, but that he told Monaghan he did not want to have anything to do with his money. This witness also testified that he had frequently played cards with Monaghan in saloons, and that upon such occasions, during periods of from two to three hours, he would take a drink every fifteen minutes, and that he was so nervous that he could not raise the glass to his lips without spilling half the contents and would often get someone to assist him in raising the glass to his lips.

J. A. Williams, a bar-tender at Schmerge's saloon, testified that he knew Monaghan for five or six years. When asked about his physical condition he said that he was an old gentleman and pretty feeble. He expressed no opin-

ion upon his mental condition, but testified that when the Bee Hive saloon was under course of construction he saw Thomas Green pay off the workmen once or twice.

F. William Sontag testified that he knew Monaghan for about three years; that during the last year of his life his health was failing and he did not seem to be as bright as formerly; that during the latter part of his life he did not seem to be able to recognize the witness. He testified, however, that Monaghan did recognize him and talked to him when he met him on the street, and that during those conversations he did not observe anything wrong with his mental condition.

James Hudson testified that he had a business transaction with Monaghan about six years ago; that he was selling a piece of property to a party who held a note against Monaghan and who wanted the witness to take the note in part payment of the purchase price; that he took the note to Monaghan's place of business; that Thomas Green, who was tending bar there, told him that Monaghan was having "one of his spells" and was lying down in his room; that he saw Monaghan and that Monaghan would not acknowledge the note; that he said he did not know whether it was his note or not; that the witness saw "his condition" and did not want to transact business with a man "in that line;" that afterwards he saw Monaghan several times and on one occasion helped him off a street car; that at that time he was not in a safe condition to "handle himself;" that the witness asked him if he could "navigate himself home," and that Monaghan replied that he could. This witness was asked the following question: "From your observation of him, talking to him in a business way, you can state what, in your opinion, whether he was of sound or unsound mind," and replied: "Well, he was not of sound mind at this time; in fact, I could not speak to him on the subject at all to any extent; he would not acknowledge the note; he did not know whether it was .

his note or not; if you do not know your own note I am satisfied you cannot do business."

John White testified that he was personally acquainted with Monaghan for about three years; that he frequently met and talked with him in Schmerge's saloon and at the Bee Hive saloon; that he rented the dance hall above the Bee Hive saloon from Monaghan; that during the last six months of his life he was "quite sociable;" that in his conversation he was very forgetful and that in talking he would "change;" that he was nervous and walked with a cane; that the witness generally met him about 10:30 o'clock at night and they would talk about various matters. Upon cross-examination this witness testified that he dealt with Monaghan exclusively in renting the dance hall and in fixing the rent therefor; that he paid him two dollars per night; that he paid Monaghan this rent the first two nights and that Monaghan then told him he could pay the rent to Mr. Green. Upon re-direct examination the witness testified that from his observation of Monaghan during the last two or three months of his life it was his opinion that he was not of sound mind.

E. H. Lamb, a sewing machine agent, testified that during the last four or five years of Monaghan's life he lived near him and saw him almost every day; that as a rule he would see him in the evening either at Schmerge's saloon or at the Bee Hive saloon; that during the last six months of his life he was quite feeble; that he was very nervous; that his mind had gone all to pieces before he died; that during the last year he was like a child; that the witness was with him nearly every evening; that in conversation he would repeat, telling the same thing over and over again as though he had never told it before; that he would want to tell the witness something new but it would always be something he had told him before. This witness was then asked: "From your association with him, observing him and talking to him, in your opinion,—the last

three months, say, before his death,—was he of sound or unsound mind, in your judgment and opinion? What do you say?" and replied, "I do not know just how to answer that question." The following question was then propounded: "Well, I will put it this way: From your observation of him, your talking to him and seeing him, in your opinion what was the condition of his mind so far as to being sound or unsound?" and the witness replied: "Well, he was of unsound mind, what I would term, in a business way; he was not able to transact business; that is the way I will frame it." On cross-examination the witness stated that he had never had any business dealings with Monaghan; that his physical disability became apparent to the witness in 1910 or 1911; that his opinion regarding Monaghan's mental condition was based on the fact that he would repeat the same story to the witness each time he met him, but the witness was unable to relate anything that Monaghan had ever repeated to him or anything that he had ever said to him which would indicate that Monaghan was of unsound mind.

Llewelyn Randall, a carpenter, testified that during the last six months of Monaghan's life he had met and conversed with him on the street and in Schmerge's saloon; that there were times when he thought he was perfectly rational and then there were times when he thought he was not capable of doing any business; that he was very nervous and would talk and act like a man who was drinking too much.

John Hartnett testified that on September 28, 1911, he met Monaghan and at his invitation went into a saloon and had a drink with him; that Monaghan was so nervous that the witness had to lift the glass to Monaghan's lips in order for him to drink.

Susan Monaghan, the divorced wife of William Monaghan, was, over the objection of appellants, permitted to testify. She testified that during their married life Mona-

ghan was a hard drinker and that in 1904 or 1905 he had delirium tremens for three weeks; that after recovering from that attack he was very nervous; that he continued to drink whisky and would get drunk and stay drunk for two or three weeks at a time, and that he never permitted himself to get sober; that judging from his actions, conduct and manner while she was living with him as his wife, he was of unsound mind. This witness was further permitted to testify that Monaghan had previously made two wills; that in the first will he had directed an equal division of his property between his two sons, and in the second will had given his son Frank a larger portion of his estate than his son James. She further testified that both of these wills had been executed before Monaghan left her, in 1907.

The testimony of Dr. R. W. Giberson, who was called by the contestants, is to the effect that the long and excessive use of intoxicants will cause a deterioration of brain cells, producing an unsound condition of the mind and mental incapacity to transact business. This witness had never seen William Monaghan.

Anthony W. Young testified that in 1906 he was mayor of Alton and knew Monaghan intimately at that time; that he seemed to converse intelligently upon all subjects but seemed a little nervous; that he last saw him in 1911; that he appeared to be getting old very fast and was very feeble; that during the fall of 1911 the witness met him on the street and spoke to him, but that Monaghan did not seem to know him nor to care to talk to him.

O. W. Weinman, a barber, testified that during the last year of his life Monaghan was in his barber shop nearly every day; that he was in poor health and very often would sleep there in the afternoon; that on one occasion, a few weeks before his death, he remained in the barber shop all night and slept in the barber chair; that he was very drunk that night and was intoxicated every day. On

265 – 16

re-direct examination he was asked: "From your observation of Mr. Monaghan, talking with him and being with him, in your opinion, now, was he of sound mind or unsound mind?" and replied, "Well, he seemed to be kind of unsound."

A daughter of Margaret Mullen testified that she lived with her aunt, Bridget Green, during the same period that William Monaghan lived with her; that she had heard Mrs. Green say that because Monaghan was drunk he did not realize what he was doing all the time.

James Monaghan, the last witness called by appellees, testified that he saw William Monaghan, his brother, three or four times during the last year of his life; that he observed that he had become nervous and "would talk a little bit wild sometimes," by which he said he meant that he "would speak of certain people in a pretty harsh manner and then in a short while would do the same thing again." He further testified that he thought during the last few months of his brother's life his mind was a little unsound.

The above is, in substance, all the testimony offered by appellees bearing upon the mental condition of the testator.

The evidence offered to establish the charge of undue influence consisted of testimony which tended to show that during the year 1907, while Monaghan was conducting the saloon in the Monaghan Hotel building, he employed Thomas Green as bar-tender; that a short time afterwards he discharged his son Frank, who was tending bar for him, and shortly afterwards left his wife and went to live with his sister Bridget Green, the wife of Thomas Green; that Thomas Green negotiated the sale of the saloon business in the Monaghan Hotel building and rendered active assistance in the building of the Bee Hive saloon, and after it was erected conducted a saloon therein; that he also usually accompanied Monaghan when any business was to be transacted or when a large sum of money was to be withdrawn from the bank. On the other hand, the evidence on behalf

of appellants shows that in November, 1910, Monaghan borrowed $1900, which was used in paying a portion of the cost of construction of the Bee Hive saloon building; that during his lifetime $1000 of this loan was re-paid, and that Monaghan attended to these transactions himself. The evidence offered by appellants also tends to show that Monaghan looked after the repairs to his buildings and employed and paid the workmen who made those repairs.

With reference to the circumstances attending the execution of the will, it was shown by the attorney who drew the will and who had attended to Monaghan's legal business for ten years, that Monaghan consulted him five or six times with reference to changing his will before the instrument in controversy was drawn and that on each occasion he came to the attorney's office alone. It was also shown by this attorney and by the two attesting witnesses to the will that no one accompanied Monaghan when he came to execute the will, and that no one was present when the will was executed except Monaghan, the two attesting witnesses and the attorney who drew the will.

The only questions presented for our determination are: (1) Is the verdict against the manifest weight of the evidence? and (2) Did the court err in admitting the testimony of Susan Monaghan? Complaint is made of the action of the court in refusing to give two of the instructions asked on behalf of the appellants, but as that matter was not assigned as one of the grounds for the motion for a new trial it is not now open for review.

The testimony on the question of undue influence is clearly insufficient to support the verdict. On the question of testamentary capacity it is evident that many of the peculiarities described by appellees' witnesses were but the maudlin actions and expressions of a drunken man. It is a grave question whether the verdict is not against the manifest weight of the evidence, even if it be conceded that all the testimony was properly admitted.

When Susan Monaghan was called as a witness and it was developed that her testimony related to the time when the marriage relation existed between her and the testator, appellants objected on the ground that she was an incompetent witness, stating as the basis of the objection (1) that she was the widow of the testator, and (2) that she was the mother of the two complainants, and thus interested. The relationship between Mrs. Monaghan and the two complainants did not make her an interested party and constituted no objection to her testifying if she was not otherwise disqualified. It having been developed that she was called to testify concerning conversations, facts and circumstances occurring during the time the marital relation existed between her and the testator, the knowledge of which she obtained only by means of such relation, the objection that she was an incompetent witness because she was the widow of the testator should have been sustained. At common law a wife could not be a witness for or against her husband as to any matter, nor could she, either during the marriage or after its termination by death or divorce, be called as a witness to testify to communications between them or to any fact or transaction the knowledge of which was obtained by means of the marriage relation. This rule of the common law has been modified by sections 1 and 5 of the Evidence act, but neither of those sections renders the wife a competent witness except in the cases enumerated in the exceptions found in section 5 of the act. (*Schreffler* v. *Chase,* 245 Ill. 395.) The testimony of Mrs. Monaghan does not fall within any of those exceptions and is clearly incompetent. Her testimony upon the vital question in the case was of such a nature that it must have strongly impressed the jury, and it was prejudicial error to admit it.

For the error indicated, the decree of the circuit court is reversed and the cause is remanded.

*Reversed and remanded.*